FILED
CLERK
10:18 am, Oct 21, 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SHAROD WILLIAMS,

                Plaintiff,

    -against-                                   13-CV-4247 (SJF)(ARL)

MICHAEL SPOSATO, *et al.*,                **OPINION and ORDER**

                Defendants.
----------------------------------------------------------------X
FEUERSTEIN, District Judge:

       Pending before the Court is the motion of defendants Corporal Hardy and the "John Doe, Officers" (the "Correction Officers") (collectively, "defendants"), in their individual capacity, seeking, *inter alia*, summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the remaining claims of plaintiff Sharod Williams ("Williams") against them in their entirety with prejudice for his failure to exhaust available administrative remedies.[1] For the reasons set forth below, defendants' motion is granted in its entirety.

I.      BACKGROUND

       In his amended complaint, Williams alleges: (i) that "every time" he asked "the defendant officers" for a grievance, they would say that his claims "were a 'non-grievable issue[,]'" (Amended Complaint ["Am. Compl."], ¶ 8); (ii) that "[a]t all relevant times, [he] made

---

[1] By order dated September 7, 2018, this Court dismissed Williams's claims against (i) Corporal Hardy, the Correction Officers, Michael J. Sposato ("Sposato") and "John Doe, Superintendent of Nassau County Jail" (the "Superintendent") in their official capacity; (ii) Sposato and the Superintendent in their individual capacity; and, (iii) as construed to be against the County of Nassau ("the County"), in their entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

1

complaints to the prison authorities at the Nassau County Jail ['the NCCC'] . . . [and] told the Supervisors of his claims and grievances when said Supervisors came to the housing unit[,]" (*id.*, ¶¶ 9-10); (iii) that he "was told by defendants to stop with the complaints or things would get worse for [him]," (*id.*, ¶ 11); (iv) that he nonetheless "continued with his grievances and complaints and, in direct retaliation, the Defendants threatened [him] with worsened conditions and did in fact carry out their threats, causing harm to [him]," (*id.*, ¶ 12); (v) that at the time of his initial complaint, he had been incarcerated in the NCCC for thirty-five (35) months and was "subjected to very harsh and foul living conditions[,] . . . include[ing] dirty showers, mice droppings on the food trays, as well as roaches and other vermin, cold winters, very hot summers, and overall conditions that were cruel and unusual and unsatisfactory for the basic standards of decent human habitability[,]" (*id.*, ¶¶13-14); (vi) that "[a]s a direct result of [his] continued and persistent complaints to various supervisors, on December 3, 2012, [he] was sent to the main, where the living Conditions were much worse[,]" (*id.*, ¶ 15); (vii) that "[o]nce in the 'Main,' the Defendant Officers told [him] not to ask for any grievances or complain about anything or things 'would get bad' for [him]," (*id.*, ¶ 16); (viii) that on May 9, 2013, "[w]hile [he] was still being held in the Main on B3C7 cell, [he] complained to Corporal Hardy about a foul smell coming out of the vents[] . . . [and] Corporal Hardy[] told [him] to 'stop being a bitch' and 'just deal with it[,]'" (*id.*, ¶ 17); (ix) that when he asked for a grievance, he "was told no," (*id.*); (x) that "hours later at 9:45 pm, while on B3C company while walking back to his cell for lock in, [he] was assaulted from behind by persons unknown and pushed into his cell bleeding really badly[,]" (*id.*, ¶ 18); (xi) that "[w]hen the Defendant Officers responded, [they] opened [his] cell and took [him] off the company[,]" (*id.*); (xii) that "[o]nce in the hallway, . . . Corporal

2

Hardy stated to [him]: 'It looks like things got really bad for you tonight. Now you have more to worry about than the smell of the Company[,]" (*id.*, ¶ 19); and (xiii) that he was then taken to the medical unit and treated for four (4) puncture wounds. (*Id.*, ¶¶ 20-21). Williams further alleges, *inter alia*, that "[d]efendants intentionally precluded [him] from seeking redress through the administrative remedy program and failed, as a result of the Defendants' deliberate indifference to protect [him] from the violent actions of other inmates." (*Id.*, ¶ 25). Williams seeks compensatory damages in the amount of one million dollars ($1,000,000.00) and punitive damages in the amount of fifty million dollars ($50,000,000.00).

Similarly, in his affidavit in opposition to defendants' motion, Williams avers, *inter alia*, (i) that while he was incarcerated at the NCCC from August 4, 2010 until December 13, 2013, "any time that [he] would ask for a grievance form [he] would be asked why it was needed and if [he] said it was for anything concerning the living conditions of the jail [he] would not be given a form at all[,]" (Affidavit of Sharod Williams dated May 5, 2019 ["Williams Aff."], ¶ 2); (ii) that he "would complain to supervisors when the[y] walked in the units and was threatened to stop doing that [and] threats were made any time that [he] tryed [sic] to complain about the living conditions of the jail[,]" (*id.*, ¶ 3); (iii) that on May 9, 2013, "[a]fter trying to file a complaint with [Corporal] Hardy [he] was told by him to stop being a bitch and to just deal with it[;]" and "[s]hortly afterwards [he] was assaulted from behind by persons unknown [and] once off of the unit [Corporal] Hardy stated to [him] that now [he] had something more to worry about other than the smell on the unit[,]" (*id.*, ¶ 4); and (iv) that "[t]hreats in NCCC were made and carried out and the grievance process is controled [sic] by the officers." (*Id.*, ¶ 5).

3

B. Procedural History

In July 2013, Williams, a former inmate at the NCCC, (Defendant's Statement pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ["Def. 56.1"], ¶ 10), commenced this civil rights action against, *inter alia*, Corporal Hardy and the Correction Officers pursuant to 42 U.S.C. § 1983 ("Section 1983"). By order dated October 1, 2013, Williams's action was consolidated with the case *Reid v. Nassau County Sheriff's Dep't*, No. 13-cv-1192, the lead case in a number of consolidated cases challenging the conditions of confinement purportedly existing at the NCCC that were commenced on or after February 28, 2013.[2]

On June 22, 2017, defendants filed a motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for partial judgment on the pleadings as against Williams, (DE 464 in 13-cv-1192), which was subsequently referred to the Honorable Steven I. Locke, United States Magistrate Judge, for a report and recommendation. On February 15, 2018, Magistrate Judge Locke issued a report and recommendation (the "Report"), *inter alia*, recommending: (i) that Williams's claims (A) against the individual defendants in their official capacity be dismissed and construed to be asserted as against the County, (B) as construed to be against the County, be dismissed without prejudice because his original complaint failed to contain any factual allegations from which an official policy or custom resulting in a violation of his constitutional rights could reasonably be inferred, (C) against the Superintendent in his individual capacity be

---

[2] By Order dated May 20, 2013, *inter alia*: (i) eleven (11) actions brought by incarcerated *pro se* plaintiffs challenging the conditions at the NCCC, were consolidated for all purposes to proceed under the lead *Reid* case; and (ii) all subsequently filed *pro se* actions relating to the subject matter of the consolidated action were directed to be consolidated under the lead case docket number.

dismissed with prejudice because his original complaint alleged no facts demonstrating the Superintendent's personal involvement in the purported constitutional violations, and (D) against Sposato in his individual capacity be dismissed without prejudice due to his failure to allege the personal involvement of Sposato in the purported constitutional violations; and (ii) that Williams be granted leave to amend his complaint to re-plead his claims against Sposato in his individual capacity and the County.

By letter dated February 20, 2018, (DE 493 in 13-cv-1192), defendants advised the Court that they did not intend to file objections to the Report. Williams did not file any objections to the Report and filed an amended complaint in accordance therewith on or about March 30, 2018. (Declaration of Daniel B. Rinaldi, Esq. ["Rinaldi Decl."], Ex. E).

By order dated May 10, 2018, this Court, *inter alia*, accepted so much of the Report as recommended that defendants' motion for partial judgment on the pleadings as to Williams be granted and, for the reasons set forth therein, dismissed Williams's claims in his original complaint in their entirety without prejudice.

By order dated September 7, 2018, this Court, *inter alia*, granted defendants' unopposed motion to dismiss Williams's claims in the amended complaint against the individual defendants in their official capacity, Sposato and the Superintendent in their individual capacity, and as construed to be against the County; dismissed those claims in their entirety with prejudice for failure to state a plausible claim for relief; and severed Williams's remaining claims against Corporal Hardy and the Correction Officers in their individual capacity from the consolidated action, to proceed under the original docket number assigned to Williams's action prior to the consolidation.

Corporal Hardy and the Correction Officers now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Williams's remaining claims against them in their entirety with prejudice for his failure to exhaust available administrative remedies.

II. DISCUSSION

A. Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) ("On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Centro de la*

*Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted); *see also Hancock v. County of Rensselaer*, 882 F.3d 58, 64 (2d Cir. 2018) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.") "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *accord Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114. "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is

not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (quotations and citations omitted).

B. Exhaustion of Administrative Remedies

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any

8

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Accordingly, the PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015); *see also Ross v. Blake*, --- U.S. ---, 136 S. Ct. 1850, 1855-56, 195 L. Ed. 2d 117 (2016) ("A prisoner need not exhaust remedies if they are not 'available.' . . . Under the PLRA, a prisoner need exhaust only 'available' administrative remedies."); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (holding that the Supreme Court's decision in *Ross* "fram[es] the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate.") Since "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained[,]' . . . an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, --- U.S. ---, 136 S. Ct. at 1858-59 (quotations and citations omitted).

In *Ross*, the Supreme Court articulated "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief[,]" *Ross*, --- U.S. ---, 136 S. Ct. at 1859, and, therefore, is not available. "First, an administrative remedy may be unavailable when it operates as a simple dead end-- with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . . In other words, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. . . . Third, an administrative remedy may be unavailable when prison administrators thwart

9

inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123-24 (quotations and citations omitted); *accord Grafton v. Hesse*, --- F. App'x ---, 2019 WL 4071753, at * 1 (2d Cir. Aug. 29, 2019) (summary order). When any of those circumstances arise, "an inmate's duty to exhaust 'available' remedies does not come into play." *Ross*, --- U.S. ---, 136 S. Ct. at 1859.

"[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court[,]" *Jones v. Bock*, 549 U.S. 199, 211, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); *see also Ross*, --- U.S. ---, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 86, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006), "provided that remedies are indeed 'available to the prisoner.'" *Cicio v. Wenderlich*, 714 F. App'x 96, 97 (2d Cir. Mar. 16, 2018) (summary order) (quoting *Ross*, --- U.S. ---, 136 S. Ct. at 1856); *see also Hicks v. Adams*, 692 F. App'x 647, 648 (2d Cir. June 19, 2017) (summary order) ("Exhaustion is mandatory, as long as remedies are actually available.") Moreover, "[e]xhaustion of a claim after the complaint has already been filed in federal court does not save the claim from dismissal." *Amaker v. Bradt*, 745 F. App'x 412, 413 (2d Cir. Dec. 19, 2018) (summary order) (citing *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *abrogated in part on other grounds by Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)); *accord Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 692 F. App'x 668, 670 n. 3 (2d Cir. June 29, 2017) (summary order). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532, 122 S. Ct. 983; *accord Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012); *Kearney v. Gebo*, 713 F. App'x 39, 41 (2d Cir. Nov. 13, 2017) (summary order).

"[T]he PLRA exhaustion requirement requires proper exhaustion," *Woodford*, 548 U.S. at 93, 126 S. Ct. 2378; *see also Johnson*, 680 F.3d at 238, "that is, using all steps that the agency holds out, and doing so properly." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quotations and citation omitted); *see also Porter*, 534 U.S. at 524; 122 S. Ct. 983 ("All 'available' remedies must . . . be exhausted."); *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) ("[T]o satisfy the PLRA a prisoner must . . . procedurally exhaust his available administrative remedies." (emphasis omitted)). "This entails both completing the administrative review process in accordance with the applicable procedural rules . . . and providing the level of detail necessary in a grievance to comply with the grievance procedures." *Amador*, 655 F.3d at 96 (alterations, quotations and citations omitted); *see also Waters v. Melendez*, --- F. App'x ---, 2019 WL 4308981, at * 1 (2d Cir. Sept. 12, 2019) (summary order) ("The PLRA requires 'proper exhaustion,' which in turn 'demands compliance with an agency's deadlines and other critical procedural rules.'" (quoting *Woodford*, 548 U.S. at 90, 126 S. Ct. 2378)); *Kearney*, 713 F. App'x at 41 ("The PLRA . . . demands compliance with the prison grievance system's procedural rules regarding administrative remedies."); *Riles v. Buchanan*, 656 F. App'x 577, 579 (2d Cir. Sept. 1, 2016) (summary order) ("Untimely or otherwise procedurally defective administrative grievances or appeals fail to satisfy PLRA's exhaustion requirements." (quotations, alterations and citation omitted)). "The exhaustion inquiry . . . requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009); *see also Jones*, 549 U.S. at 218, 127 S. Ct. 910 ("Compliance with prison grievance procedures[] . . . is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to

11

comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Johnson*, 680 F.3d at 238 ("[P]risoners must complete the administrative review process in accordance with the applicable procedural rules-- rules that are defined not by the PLRA, but by the prison grievance process itself." (quotations and citation omitted)).

Since "failure to exhaust is an affirmative defense under the PLRA," *Jones*, 549 U.S. at 216, 127 S. Ct. 910, "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute[.]" *Hubbs*, 788 F.3d at 59 (quotations, alterations and citations omitted). "Once defendants have met their initial burden of demonstrating that a grievance process exists, . . . [the] plaintiff bears the burden of 'demonstrat[ing] that other factors . . . rendered a nominally available procedure unavailable as a matter of fact.'" *White v. Velie*, 709 F. App'x 35, 38 (2d Cir. Sept. 15, 2017) (summary order) (alterations in original) (quoting *Hubbs*, 788 F.3d at 59).

1. The NCCC's Inmate Grievance Procedure

The NCCC Inmate Handbook, effective as of April 1, 2010, of which every inmate receives a copy upon his or her arrival at the NCCC, (Def. 56.1, ¶¶ 1, 11), provides a three (3)-step process for the handling of inmate grievances. (*Id.*, ¶ 3). To initiate the process, an inmate must complete a grievance form, available in the Inmate Law Library; during Inmate Council meetings; and, upon request, at the housing area officer's station, and file it, by "plac[ing] it into the grievance mailbox located in each housing area[,]" (Declaration of Stephanie L. White

["White Decl."], Ex. A at 4), "within five (5) days of the date of the act or occurrence leading to the grievance." (*Id.*). A grievance is defined, in relevant part, as "a written inmate complaint concerning either written or unwritten facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility." (*Id.*). "Any grievance that is too vague to understand or fails to set forth supporting evidence or information will be returned to [the grievant]," (*id.*) (emphasis omitted), and his or her "[f]ailure to supply sufficient information or evidence within two (2) days shall be cause to deny the grievance." (*Id.*) (emphasis omitted).

The grievance form is reviewed by a grievance coordinator. (Def. 56.1, ¶ 6). "Within five (5) business days of receipt of a grievance, the Grievance Coordinator will issue a written finding[,] . . . specify[ing] the facts and circumstance underlying [his or her] determination." (White Decl., Ex. A at 4). "A copy of such finding will be provided to [the grievant]." (*Id.*).

"Within two (2) business days after receipt of the Grievance Coordinator's written findings, [the grievant] may appeal a negative finding to the Chief Administrative Officer ['CAO']." (White Decl., Ex. A at 4). "Within three (3) business days of receipt of the [CAO's] determination, [the grievant] may appeal a grievance denied by the facility, in whole or in part, to the N.Y.S. Commission of Correction by indicating [his or her] desire to appeal on the Inmate Grievance form, in the space provided for such purpose." (*Id.* at 5).

Since defendants satisfied their initial burden of demonstrating that a grievance process exists at the NCCC, the burden shifted to Williams to demonstrate, by citation to evidence which would be admissible at trial, *see* Fed. R. Civ. P. 56(c), that other factors rendered that process "unavailable as a matter of fact." *White*, 709 F. App'x at 38. Williams has not satisfied that burden.

13

2. Williams's Grievances

Initially, the administrative scheme set forth in the NCCC's Inmate Handbook is clearly discernible and navigable to the ordinary prisoner and, thus, is not "so opaque that it becomes, practically speaking, incapable of use." *Williams*, 829 F.3d at 123-24 (quotations and citations omitted).

Moreover, the record reflects that Williams was given, or otherwise received or had access to, a copy of the Inmate Handbook, (Def. 56.1, ¶ 11), and that prior to the date on which he filed the amended complaint, *i.e.*, March 30, 2018, he failed to fully avail himself of all of the available inmate grievance procedures set forth in the Inmate Handbook. (*Id.*, ¶ 15). Although Williams submitted, and received the results of, four (4) grievances pursuant to the initial step of the inmate grievance process prior to March 30, 2018, none of those grievances were fully appealed in accordance with the three (3)-step inmate grievance process set forth in the NCCC's Inmate Handbook. (*Id.*, ¶¶ 16-17).

Specifically, Williams submitted his first grievance (number 012-10-11) on September 30, 2011, complaining that his request "for something for a head cold" was denied and he was told "to drop a sick call slip," but he was "drop[p]ing slips" and still had not "been called and [his] problems [were] only getting worst [sic]." (White Decl., Ex. B). Williams did not request any specific relief with respect to this grievance. However, the grievance coordinator accepted the grievance, finding that "[t]he healthcare provider evaluated the grievant on 10/19/11 at sick call[;] no explanation was given to this office by the provider for the delay[,]" and Williams accepted the grievance coordinator's decision. (*Id.*).

Williams submitted his second grievance (number 123-08-13) on August 20, 2013,

complaining that the NCCC received a package for him on August 7, 2013, but "the package was not given to [him] [and] for some reason it was given to someone else." (White Decl., Ex. C). Williams further indicated on the grievance, *inter alia*, that he either wanted his package "or for the jail to pay for [his] package," and he wanted to know to whom the package was given. (*Id.*). However, Williams withdrew this grievance after receiving the package on August 23, 2013. (*Id.*).

Williams also submitted his third grievance (number 124-08-13) on August 20, 2013, complaining that on August 16, 2013, he received a visitor at approximately 4:09 p.m. but he was not called for the visit until 5:15 p.m., by which time his visitor had left. (White Decl., Ex. D). Williams requested that "necessary steps . . . be taken to make sure this doesn't happen again. And for the officer or officers responsible to be dealt with." (*Id.*). The grievance coordinator accepted that grievance, finding that Williams's claim was substantiated; that the visit was not consummated due to "equipment malfunction which failed to notify [Williams's] housing unit of his visit;" and that Williams "wasn't charged for this mishap and . . . receive[d] a visit on 8/20/13 without incident." (*Id.*). A work order was submitted for the printer at issue; the computer unit was made aware of the situation; and the visiting unit was advised to call the housing units for visits. (*Id.*). Williams accepted the grievance coordinator's decision. (*Id.*).

Williams submitted his fourth grievance (number 181-08-13) on August 29, 2013, complaining that at approximately 6:10 a.m. that day, "[w]hile serving the breakfast meal and opening a tray[,] there was mice droppings in the tray with the food." (White Decl., Ex. E). Williams further alleged that "[t]he officers who were working the housing unit took the tray and put it to the side to show to the kitchen, please check the log book." (*Id.*). Williams requested

15

"[t]hat the proper steps be taken so that this will not happen again." (*Id.*). The grievance coordinator accepted Williams's fourth grievance, finding: (i) that although the "staff assigned to [Williams's] housing area received no reports of mice droppings from any inmate on the date and time at issue[,] . . . the E-building kitchen supervisor was made aware of [Williams's] complaint[;]" and (ii) that the kitchen supervisor "will speak with his staff about the seriousness [of] keeping food in a sanitary manner prior to serving inmates." (*Id.*). Williams refused to sign that decision, *i.e.*, he did not accept or appeal the grievance coordinator's decision. (*Id.*).

Far from demonstrating that any officer at the NCCC was "unable or consistently unwilling to provide any relief" to Williams, *Williams*, 829 F.3d at 123-24 (quotations and citations omitted), the record evidence demonstrates that Williams either received the relief he sought, or other appropriate relief which he accepted, for the four (4) grievances he submitted prior to commencing this action. *See, e.g. Grafton*, --- F. App'x ---, 2019 WL 4071753, at * 2 (finding that the plaintiff's "past grievances containing the notation 'Grievance Accepted'[] undermine[d] his argument that prison staff had made the prison grievance system a dead end by not collecting and processing grievances as required.") Specifically, Williams withdrew his second grievance after receiving the relief he sought therein, *i.e.*, getting the package at issue; and he also received either the relief he sought, or other appropriate relief which he accepted, with respect to his other three (3) grievance: (i) he was evaluated by a healthcare provider for the sick calls which were the subject of his first grievance; (ii) the "necessary steps" were taken to ensure that he would not miss a visit again, which was the subject of his third grievance, *e.g.*, the issue was investigated and substantiated, a work order was submitted to repair the malfunctioning printer, and there were no further incidents with Williams's subsequent visits;

16

and (iii) "proper steps" were taken to ensure that mice droppings would not appear on the food trays, which was the subject of his fourth grievance, *e.g.*, the kitchen supervisor was informed of Williams's complaint and indicated that he would speak with his staff about keeping food in a sanitary manner, and there is no indication that Williams ever encountered a similar problem with the food trays again.

Moreover, the record is devoid of any evidence from which a rational jury may reasonably infer that any prison administrator or officer thwarted Williams from taking advantage of any part of the grievance process "through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123-24 (quotations and citations omitted). Indeed, contrary to Williams's claims that "every time" he requested a grievance from "the defendant officers," they would say that his claims "were a 'non-grievable issue[,]'" (Am. Compl., ¶ 8); or that "any time that [he] would ask for a grievance form [he] would be asked why it was needed and if [he] said it was for anything concerning the living conditions of the jail [he] would not be given a form at all[,]" (Williams Aff., ¶ 2), the record evidence indicates that Williams was able to obtain grievance forms, file grievances and obtain the relief he sought with respect to four (4) separate issues relating to incidents and conditions at the NCCC, three (3) of which occurred after he allegedly was threatened with retaliation for making complaints and/or filing grievances and purportedly assaulted by unknown individuals. *See, e.g. Grafton*, --- F. App'x ---, 2019 WL 4071753, at * 1 (finding that where the plaintiffs "pleaded that they had filed grievances subsequent to the staff members' threats[,] . . . [t]he district court . . . properly determined staff members' intimidation had not made the prison grievance system unavailable to [them].") Where, as here, "there has been no affirmative action by prison staff actually preventing

prisoners from pursuing administrative remedies, those remedies are not unavailable under the PLRA." *Grafton*, --- F. App'x ---, 2019 WL 4071753, at *1; *see, e.g. McNab v. Doe*, 686 F. App'x 49, 51 (2d Cir. Apr. 7, 2019) (summary order) (affirming summary judgment dismissing the plaintiff's complaint for failure to exhaust where although the plaintiff asserted that the defendants tried to intimidate him, "none of the actions allegedly taken by the defendants actually prevented [him] from submitting his complaint letter."); *Riles*, 656 F. App'x at 581 (finding that the defendants' alleged threats of retaliation did not interfere with his exhaustion efforts because although the plaintiff claimed that a corrections officer "threatened to punish him if he 'pushed the issue[,]' . . . he thereafter submitted . . . [a] grievance in spite of this alleged threat. . . . He was not deterred from exhausting; he simply did not exhaust in accordance with the procedures.")

Williams's conclusory assertions that administrative remedies were not available and that exhaustion would have been futile are insufficient to defeat summary judgment. *See generally Flores*, 885 F.3d at 122 ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)). Since a rational jury could not reasonably find: (i) that any officer or prison administrator at the NCCC was unable or consistently unwilling to provide any relief to Williams, or thwarted him from taking advantage of any part of the grievance process "through threats, game-playing, or misrepresentations," *Ross*, --- U.S. ---, 136 S. Ct. at 1862; or (ii) that the NCCC's grievance process was not discernible or navigable to the ordinary prisoner, there is no genuine issue for trial with respect to the issue of the availability of

18

administrative remedies at the NCCC.

Moreover, the record evidence demonstrates that Williams did not properly exhaust any of his claims in the amended complaint, *i.e.*, he did not complete the three (3)-step grievance process in accordance with the procedural rules set forth in the Inmate Handbook with respect to any of his grievances. Furthermore, Williams did not file any grievance with respect to his claims in the amended complaint relating to, *inter alia*, dirty showers; the presence of roaches and "other vermin"; the temperature and "overall conditions" of his cell and/or housing unit; a "foul smell" emanating from the vents; or an assault by unknown individuals.[3] Since administrative remedies were available to Williams, and he did not properly exhaust any of his remaining claims against Corporal Hardy and the Correction Officers, in their individual capacity, in the amended complaint, the PLRA precludes him from proceeding with those claims in this Court. *See Jones*, 549 U.S. at 211, 127 S. Ct. 910. Accordingly, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted and Williams's remaining claims in this action are dismissed in their entirety with prejudice for his failure to exhaust available administrative remedies.

III.   CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment pursuant to

---

[3] Moreover, Williams does not allege that Corporal Hardy and the Correction Officers had any personal involvement in the allegedly "very harsh and foul living conditions" to which he was purportedly subjected at the NCCC; nor in his allegedly retaliatory transfer "to the main" on December 3, 2012. (Am. Compl., ¶¶13-15). *See generally Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quotations and citation omitted)); *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) ("To establish a section 1983 claim, a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." (quotations and citation omitted)).

Rule 56 of the Federal Rules of Civil Procedure is granted and defendants are granted judgment as a matter of law dismissing Williams's remaining claims in this action in their entirety with prejudice for his failure to exhaust available administrative remedies. The Clerk of the Court shall enter judgment in favor of defendants and close this case. Pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court shall serve notice of entry of this order upon Williams and defendants in accordance with Rule 5(b) of the Federal Rules of Civil Procedure.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962).

SO ORDERED.

                  /s/ *Sandra J. Feuerstein*
                  Sandra J. Feuerstein
                  United States District Judge

Dated: October 21, 2019
    Central Islip, New York